## CAREY v. PEOPLES MORTGAGE CORPORATION, et al.

Circuit Court, Dade County.

July 22, 1953.

G. Hugo Whitehouse and James S. Dunn, both of Miami, for plaintiffs.

Hugh M. Carrier and Graham C. Miller, both of Miami, for defendants Peoples Mortgage Corporation and Etha Beck.

Roger Edward Davis, Miami, for defendants John Freedman and Belle Freedman.

WAYNE ALLEN, Circuit Judge.

Set forth in full below is the report of G. Kenneth Kemper, Esq., special master in chancery—

This is a suit in equity for a declaratory decree and other relief, brought by the plaintiffs Charles Carey and Elizabeth Carey, his wife, against the defendants Peoples Mortgage Corporation (hereinafter sometimes referred to as "the corporation"), Etha Beck, and John Freedman and Belle Freedman, his wife.

The complaint alleges that on or about March 4, 1952 the plaintiffs applied to the corporation in Miami for a loan on their real property in Dade County in order to pay off an existing mortgage on the property in the sum of $1,850 and a balance they owed to a finance company in the amount of $197.12. At that time, the plaintiffs allege they signed various papers, some of which were in blank. They later discovered that the mortgage which they received was in the amount of $2,750 providing for payments in the amount of $50 monthly, bearing interest at the rate of 10% per annum. This mortgage deed bore the name of the defendant Etha Beck, as mortgagee—not the name of the corporate defendant.

Plaintiffs allege that the mortgage at that rate of interest—being in a sum greatly in excess of the amount they actually borrowed—was usurious under the provisions of section 687.03, Florida Statutes 1951. They allege that on March 21, 1952 the note and mortgage were assigned by Etha Beck to the defendants John and Belle Freedman, that the Freedmans were aware of the usurious character of the mortgage, and that the circumstances constituted

a conspiracy on the part of all the defendants to circumvent the Florida usury laws. They ask that the court judicially determine and ascertain whether the said interest contract is valid under the laws of this state and if found to be invalid, that it be declared null and void and the illegally charged interest forfeited.

Each of the defendants filed answers to the bill, denying that there was any usury or that there was any conspiracy to circumvent the usury statutes.

Two hearings were held before the master, at which all the parties were represented by their attorneys, and testimony was taken of the various parties and witnesses. The transcribed record of the proceedings before the master, consisting of 130 pages, together with 11 exhibits offered in evidence, are filed herewith.

All of the individual parties are residents of Dade County and are sui juris. The corporate defendant is a Florida corporation, and holds itself out as engaging in the business of making mortgage loans in Dade County.

This court has jurisdiction of all the parties and of the subject matter of this action. The evidence, as it developed during the hearings, showed the following—

Prior to March 4, 1952 plaintiffs owned a small duplex house on property in Dade County which was encumbered by a mortgage in favor of Ed Burts which had originally been in the amount of $3,500 but which on March 4, 1952 had a balance due and owing in the amount of $1,850. Payments on this mortgage were several months in arrears.

In addition, plaintiffs owed a small loan in the amount of $197.12 to the Family Finance Co., a Florida corporation. This loan did not constitute a mortgage against the real property.

The plaintiffs are negro people, and their real property is located in a section which may be described as a "colored section." The plaintiff Elizabeth Carey can read and write, but the plaintiff Charles Carey can neither read nor write.

At some time shortly prior to March 4, 1952 plaintiffs heard a radio announcement concerning Peoples Mortgage Corporation. They testified that this announcement did not state that the defendant corporation was merely a mortgage brokerage company, but that they understood it actually made the mortgages which were announced. Murray Beck, president of the corporation, testified also that he did not believe the announcement stated that the corporation was merely a brokerage company.

On March 4, 1952 both plaintiffs went to the office of the corporation in Miami and there discussed their problem with two men in the office. At that time they signed various papers. The papers they signed on that day were an application for a mortgage, admitted in evidence as plaintiffs' exhibit #2, and a note and mortgage which were admitted in evidence as plaintiffs' exhibit #4.

Plaintiffs' exhibit #2, the application for mortgage, is a form containing several blanks. These forms are filled in in pen and ink handwriting. Among the blanks filled in in handwriting is the sum of "$2,750.00," the amount of the mortgage applied for, and the sum of "$750.00," the commission to be paid to the corporation. Plaintiff Elizabeth Carey testified that these handwritten fill-ins were not written on the application at the time she signed it, but she admitted that she did not read the application at the time she signed it. Plaintiff, Charles Carey did not, and could not, read the application. Murray A. Beck, who accepted the application on behalf of the corporation, testified that these blanks were filled in at the time the application was signed.

The application, which is in the form of a letter from Charles and Elizabeth Carey to the corporation, contains the following paragraph—

> In consideration of your accepting employment on our behalf in this matter, we agree to pay you the sum of $750.00 as a commission; such payment to be conditioned upon the consummation of the transaction referred to herein. This payment will cover not only your commission, but also all costs incidental to the consummation of the transaction.

The sum of $750.00 in the foregoing paragraph is written in ink —the rest of the quoted paragraph is typewritten. The application also states that the mortgage to be obtained shall be in the sum of $2,750 for a period of three years, payable at $50 per month including interest at 10% per year. The mortgage signed on the same day is from the plaintiffs as mortgagors to Etha Beck, as mortgagee.

The note attached to the mortgage, which was signed on the same day, is also from the plaintiffs to Etha Beck and is in the amount of $2,750, payable $50 per month with interest at the rate of 10% per annum, providing for 35 monthly payments. The note also provides that the entire principal and interest due thereunder shall become due and payable on March 15, 1955.

Plaintiffs testified that at the time they signed the mortgage and note they did not contain the amounts or the name of the mortgagee-payee. The witnesses to the mortgage are Murray A. Beck,

president of the corporation, and Lawrence A. Beck, his brother, an employee of the corporation. It was notarized by Lawrence A. Beck. Murray Beck testified that all the blanks on the note and mortgage were filled in at the time the Careys signed them.

As stated above, the note and mortgage signed by the plaintiffs in this case are to Etha Beck, who is the mother of the president of the corporation, Murray Beck, and of Lawrence Beck, a corporation employee. Lawrence Beck is the husband of Lillian Beck, who is an officer and stockholder of the corporation. Etha Beck testified that at the time the mortgage in this case was signed she had not inspected the Carey property, she had not met the Careys, and concerning this particular mortgage she stated— "All I do know is my son called me up and asked me if I wanted to take a mortgage and I said 'if it is all right, it is all right with me,' but I don't know who the people were or anything." She also stated that she did not recall how many similar transactions she had had with the corporation, she was not familiar with the mortgage loan business, she never saw the customers to whom she lent money, and she came in only to sign the documents. She said she was not familiar with real estate values in Miami, she made no inquiry as to where the parties to mortgages were employed or what their occupations were, and she did not look closely at the percentage charged on the mortgages.

Etha Beck stated that she paid $2,750 for the mortgage in this case. She also stated that she got all this money back when she sold the mortgage. The evidence shows that she assigned the mortgage to the Freedmans on March 16, 1952, two weeks after it was made. One of the checks introduced in evidence as part of the defendant Freedmans' exhibit C, is a check in the amount of $2,693.40 payable to Etha Beck, signed by Roger Edward Davis Trust Account, Roger Edward Davis being the attorney for the Freedmans. Murray Beck testified that the balance of $56.60, representing Mr. Davis' attorney's fee and additional cost items, was paid by the corporation to Etha Beck, saying— "Then I reimbursed my mother for the $56.60, because there was no reason for her to lose money by the transaction." Etha Beck also testified that she neither paid nor received any other monies in the transaction.

When asked how he usually obtains the funds in a normal mortgage transaction, Murray Beck replied— "We make an appointment with the prospective mortgagees and take them out and show them the property, then if they feel that is a mortgage they want, they will then put the funds up, and they put it up with their attorney and then we send everything over there for closing."

The evidence shows that all of this procedure was followed when the mortgage was assigned from Etha Beck to the Freedmans—but none of these steps were taken when the mortgage was originally signed to Etha Beck.

From the above circumstances and from the evidence as a whole, it is apparent to the master, and he so finds, that the relationship of Etha Beck and the Peoples Mortgage Corporation in this transaction was collusive, and was for the purpose of attempting to evade the statutes of this state prohibiting usury.

The master finds that the plaintiffs have failed to produce sufficient evidence to show that either John Freedman or Belle Freedman were guilty of any conspiracy to evade the usury statutes with the corporation or with Etha Beck, or that the Freedmans took the note and mortgage with any notice of any infirmity therein, or with any notice that there was any attempt to evade the usury statutes in connection therewith. The evidence shows that the note and mortgage were valid on their faces, they were admittedly signed by the plaintiffs, and they were taken by the Freedmans without any prior default in the payments or any notice of any other circumstances that would indicate any infirmity therein. The master therefore finds that the note and mortgage are valid obligations, and that the Freedmans are holders in due course thereof.

The master finds that the sums actually received by the plaintiffs or expended on their account from this mortgage loan are as follows—

| | |
|---|---:|
| Amount expended by Peoples Mortgage Corporation to Ed Burts, in payment of the prior mortgage on the Carey property | $1,840.00 |
| Amount paid by Peoples Mortgage Corporation to Family Finance Co. in payment of the loan owed by the Careys | 197.12 |
| | $2,037.12 |

The master finds that the actual cost items expended by the corporation for which the plaintiffs are rightfully obligated include abstracting and certain other costs in the total sum of $36.

The master finds that the costs and expenses of assigning the mortgage to the Freedmans are not rightfully chargeable to the plaintiffs. For the information of the court, these costs and charges are as follows—

| | |
|---|---:|
| Attorney's fee of Roger Edward Davis | $50.00 |
| Paid to Security Abstract Co. for abstract continuation and recording costs | 6.60 |
| | $56.60 |

The master finds that the interest rate on $2,750 which plaintiffs are obligated to pay under the terms of the note and mortgage is the maximum legal rate of interest in this state. The master also finds that in addition to such maximum rate of interest, Etha Beck and the corporation, in collusion, reserved, charged, or took, the additional sum of $676.88. Although this sum is variously described in the evidence as "brokerage" or "commission," the master finds that said sum was actually usurious interest exacted by Etha Beck and the defendant corporation, in collusion, in violation of the provisions of chapter 687, Florida Statutes 1951, and in particular, section 681.03 thereof.

The master further finds that the amount of interest which plaintiffs must pay over the three-year term of the mortgage is $668.48. Adding this sum to the amount of $676.88 described in the preceding paragraph, the master finds that the total amount of interest exacted under this transaction is $1,345.36. Allocated over the three-year term of the mortgage, the master finds that the interest per annum is $448.45. Since the amount of $448.45 is less than 25% of the true principal of $2,073.12, this transaction does not come within the terms of section 687.07, Florida Statutes 1951 (requiring the forfeiture of both principal and interest).

The master further finds that the amount of usurious interest exacted by Etha Beck and the corporation, in collusion, in this transaction is the sum of $676.88, as calculated according to the provisions of section 687.03. The master finds that double such amount of usurious interest as provided in section 687.04 is the amount of $1,353.76, and recommends that this court render judgment in such amount in favor of the plaintiffs against Etha Beck and the corporation.

The master further finds that plaintiffs are entitled to a judgment against Etha Beck and the corporation for their attorney's fees herein. Plaintiffs, however, offered no proof or evidence showing the reasonable amount of an attorney's fee herein. An attorney's fee is allowable to plaintiffs under the provisions of section 687.04, which further provides that such attorney's fee shall be as provided in section 687.06. Section 687.06 provides as follows—

> * * * provided further, that it shall not be necessary for the court to adjudge an attorney's fee, provided in any note or other instrument of writing, to be reasonable and just, when such fee does not exceed ten per cent of the principal sum named in said note, or other instrument in writing.

An attorney's fee of 10% of the amount of judgment recommended in this case, would be the sum of $135.38.

By order of this court dated December 30, 1952 plaintiffs were ordered to deposit with the registry of the court the sum of money allegedly due each month to the defendants John and Belle Freedman. The final decree herein should provide that the sums deposited under the provisions of that order should be released from the registry of the court unto John and Belle Freedman.

Your master would show that the taking of testimony before him required two half day hearings, that in addition four separate briefs were filed by counsel raising highly technical questions of law, that numerous exhibits were filed, that your master has spent considerable time and study on the case, and that due to the work involved and the technical questions of law presented he believes a reasonable master's fee would be the sum of $125.

Accordingly, your master recommends—

1. That a declaratory decree be entered by this court, decreeing and determining that in procuring the mortgage dated March 4, 1952 Etha Beck and the Peoples Mortgage Corporation acted in collusion in an attempt to evade the usury laws of the state of Florida; that Etha Beck and the Peoples Mortgage Corporation reserved, charged, or took a rate of interest greater than 10% per annum; that the amount of usurious interest exacted by Etha Beck and the Peoples Mortgage Corporation was the sum of $676.88; and that judgment be entered in favor of the plaintiffs herein against Etha Beck and Peoples Mortgage Corporation for the sum of $1,353.76 (being double the amount of said usurious interest), plus attorney's fees in the amount of $135.38, plus the costs of this action.

2. That this suit be dismissed as to the defendants John Freedman and Belle Freedman, his wife, and that the sums now held in the registry of this court by virtue of the order of this court dated December 30, 1952 be paid to John Freedman and Belle Freedman, his wife.

---

The parties having settled this suit and having stipulated that it be dismissed with prejudice at plaintiffs' cost and that the sums deposited be paid to John and Belle Freedman, it is ordered that the suit be dismissed with prejudice and at plaintiffs' cost and that the money now held in the registry of the court under the order of December 30, 1952 be paid to John Freedman and Belle Freedman, his wife, or to their attorney, by the clerk of the court, forthwith.

Had this suit not been settled I should have ratified, approved and confirmed the special master's report filed herein and the findings of fact and conclusions of law stated therein, making it the court's report, order and decree.

Through the industrious efforts not only of the special master but of the attorneys for the plaintiffs, Messrs. Whitehouse and Dunn, all vigorous young men in their early thirties, a method has apparently been found to halt the usurious practices which unfortunately are so widespread in our community.

The purpose of the declaratory judgment statutes in chapter 87, Florida Statutes 1951, as stated in section 87.11 thereof, is—"to settle and to afford relief from insecurity and uncertainty with respect to rights . . ."

In section 87.02 the legislature wisely provided that—"Any person claiming to be interested or who may be in doubt as to his rights under a deed . . . contract . . . or whose rights . . . are affected by a statute . . . may have determined any question of construction or validity arising under such statute . . . contract, deed . . . and obtain a declaration of rights, status or . . . legal relations thereunder."

The facts in this case in my opinion, were "made to order" for adjudication under the declaratory judgment statutes. Let us hope the usurers may yet be driven from our midst.